United States District Court
Middle District of Florida
Tampa Division

**MATTHEW PETERS,**

> *Plaintiff,*

V.                                                                    **NO. 8:16-CV-1901-T-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

> *Defendant.*

---

## Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Commissioner of Social Security denying Matthew Peters's claim for disability insurance benefits and supplemental security income.[1] He seeks reversal, Doc. 22; the Commissioner, affirmance, Doc. 23. This order adopts the summaries of facts in

---

[1]The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of their denial. *Bowen v. City of New York*, 476 U.S. 467, 471–72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900–404.906, 416.1400–416.1406. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907–404.918, 416.1407–416.1418. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929–404.943, 416.1429–416.1443. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967–404.982, 416.1466–416.1482. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. §§ 404.981, 416.1481. 42 U.S.C. § 405(g) provides the basis for the court's jurisdiction to review final agency decisions concerning disability insurance benefits. 42 U.S.C. § 1383(c)(3) incorporates § 405(g) for final agency decisions concerning supplemental security income.

the Administrative Law Judge's ("ALJ's") decision, Tr. 17–25, and in the Commissioner's brief, Doc. 23 at 2–4.[2]

## I.    Framework

The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) he is engaged in substantial gainful activity, (2) he has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) he can perform any of his past relevant work given his residual functional capacity ("RFC"), and (5) there are a significant number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.    Issues

Peters presents three issues: (1) whether the ALJ erred at step two by failing to find morbid obesity, psoriasis (reddish, silvery-scaled lesions, typically on the elbows, knees, scalp, and trunk),[3] and arthralgia (severe, noninflammatory joint pain) severe impairments; (2) whether the ALJ erred by failing to develop the record; and (3) whether the ALJ complied with the Eleventh Circuit's pain standard. Doc. 22 at 2, 7–8.

## III.    Background

Peters was born in 1979 and last worked in March 2008. Tr. 177, 184, 202, 215. He has a high-school education and experience as a stocker at a grocery store, a stocker and shipper at a distribution center, a shipper at a bagel factory, and a concession-stand worker at a movie theater. Tr. 203, 215. He alleges he became

---

[2]Peters adopts the ALJ's summary of testimony and documentary evidence. *See* Doc. 22 at 3.

[3]All parenthetical definitions of medical terms are from Stedman's Medical Dictionary (William R. Hensyl et al. eds., 25th ed. 1990).

disabled in March 2008 from a learning disability and other mental impairments. Tr. 177, 184, 202. He is insured for disability insurance benefits through September 2008. Tr. 190. He was represented by an attorney during the administrative process. Tr. 15. He proceeded through the administrative process, failing at each level. Tr. 1–6, 12–29, 72–73, 82–83. This case followed. Doc. 1.

## IV.  Evidence

### A.  *School Evidence*

According to transcripts from Peters's high school, his grades ranged from an F in English to an A in band. Tr. 264. A technical assessment completed at the school rated his general learning ability in the average range and recommended the following programs: auto body technology, auto services technology, construction trades technology, architectural drafting, heating/ventilating/cooling, machine trades technology, welding technology, electronics technology, graphic arts technology, and video/applied communications. Tr. 265. He scored above critical norms in spatial aptitude, form perception, manual dexterity, general learning ability, numerical aptitude, and clerical perception. Tr. 266–67.

When Peters was in the eleventh grade, an examiner reported he had struggled with school and staff members were concerned but he was a "bright young man who has much potential." Tr. 273. Math was a strength; he performed at a ninth-grade level and could apply knowledge to everyday life. Tr. 273. He read at almost an eighth-grade level and was "able to gain meaning from what he [read] even if he [was] unable to read each and every word in a passage." Tr. 273. He often had to re-read a passage and needed time to process but could produce the correct response if given enough time. Tr. 273. His written-language skills were deficient, and he spelled at almost a fifth-grade level, though he appeared to understand sentence-writing mechanics. Tr. 273. His general knowledge was at a seventh-grade level. Tr. 273.

An Individualized Educational Planning Committee report completed before graduation designates no primary handicap and indicates he completed a special education curriculum and regular vocational education. Tr. 268–70.

## B.  *Medical Evidence*

In March 2013, Thomas Antonek, Ph.D., examined Peters at the request of the Florida Department of Health, Division of Disability Determinations. Tr. 258–60. He conducted a clinical interview and a mental status examination, reviewed background information from the Division of Disability Determinations, and reported the following. Tr. 258.

Peters's parents drove him to the appointment, and he completed the written paperwork "without incident." Tr. 258. He was dressed casually, exhibited adequate hygiene, and looked his stated age. Tr. 258. His psychomotor movements were within normal limits. Tr. 258. He was cooperative and had adequate conversation skills but spoke softly; limited the conversation to short, simple, and concrete responses; showed marked impairment in the use of multiple nonverbal behaviors; and showed a lack of social and emotional reciprocity. Tr. 258. He had slow and concrete thought processes; no loose associations or flight of ideas; adequate concentration and attention; intact immediate, recent, and remote memory; impaired judgment and insight; low average intellectual ability; depressed mood; and congruent affect. Tr. 258. He was oriented to person, place, time, and situation and denied hallucinations and suicidal ideation. Tr. 258.

Peters reported he had been diagnosed with learning disabilities in reading, writing, and comprehension in the second grade and was in special education classes throughout school. Tr. 259. He did not have many friends in school and preferred to be alone. Tr. 259. He began mental health treatment for depression in January 2013 (two months before the consultative exam). Tr. 259. He experiences sadness, helplessness, increased irritability, concentration difficulties, motivational difficulties, social isolation, withdrawal, and low self-esteem. Tr. 259. In a normal

4

day, he gets up, watches television, showers, eats, and plays video games. Tr. 259. He can perform activities of daily living but lacks motivation. Tr. 259. His longest job was just over two years at a movie theater, but he was fired because he watched a few seconds of a movie. Tr. 259. His most recent job was working at a factory for about a year, but he left that job to move to Florida. Tr. 259. He has never lived independently, living first with his parents, then with his sister, and now with his grandparents. Tr. 259. He takes no medication. Tr. 259.

Dr. Antonek summarized, "Overall, the score obtained on the 'Mini Mental Status Exam' was in the High or Normal Range of functioning. This indicates that the claimant is unlikely to be suffering from cognitive impairment which would interfere with daily functioning." Tr. 259 (internal emphasis omitted). He listed diagnoses of recurrent major depressive disorder, rule out Asperger's disorder, rule out reading disorder, and rule out disorder of written expression; assigned a Global Assessment of Functioning ("GAF") scale rating of 50;[4] and opined Peters can manage funds. Tr. 260. He recommended individual psychotherapy to help coping skills, consultation with a psychiatrist or nurse for psychotropic medication, intellectual testing to assess baseline cognitive function and potential learning disabilities, and

---

[4]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." DSM-IV at 32–34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* A GAF scale rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.*

The latest edition of the DSM has abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). Even before that abandonment, "the Commissioner … declined to endorse the GAF scale for use in the Social Security and SSI disability programs, and … indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (internal quotations omitted) (citing 60 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)); *see also McGregor v. Astrue*, No. 8:08-cv-2361-T-TGW, 2010 WL 138808, at *3 (M.D. Fla. Jan. 10, 2010) (unpublished) (GAF scale rating carries no meaningful weight).

referral to vocational rehabilitation. Tr. 260. He opined Peters's emotional and psychological functioning are "guarded" and mitigating factors include "the chronic nature of the multiple co-morbid psychiatric conditions, the absence of any consistent contemporary employment history, the lack of independent living skills, and the inability to secure continuity of health care without health insurance or the economic resources to pay for services rendered." Tr. 260.

In June 2014, the Division of Vocational Rehabilitation referred Peters to Jeffrey Merin, Ph.D., P.A., for evaluation of his learning disability and a personality assessment. Tr. 277–83. Dr. Merin reviewed Peters's history and, in addition to the history described in other reports, noted he had been found guilty of possession of child pornography, had been sentenced to five years' probation (ending in 2019), and is a registered sex offender. Tr. 277–78. He also noted Peters complained of chest pain, palpitations, profuse sweating, generalized fear, and emotional factors that aggravate his psoriasis. Tr. 278.

A mental status examination showed Peters was cooperative, compliant, and oriented in all spheres with no evidence of a formal thought disorder or manic condition. Tr. 278. He exerted "good levels of effort and motivation" but had trouble responding "in a cogent and timely manner." Tr. 278. He had simplistic, concrete, and limited communication skills; gave coherent and logical information; displayed appropriate affect with no evidence of emotional distress; and described his mood as mildly depressed and anxious due to his probationary status and unemployment. Tr. 279. He wore a long-sleeved shirt though it was a hot day, explaining the sleeves protect his psoriasis. Tr. 278.

Intellectual testing placed Peters in the average range for verbal comprehension and perceptual reasoning but revealed significant weaknesses in abstraction and vocabulary and relative weaknesses in attention, concentration, and fine motor dexterity under timed conditions. Tr. 280. His nonverbal abilities were in the average to above-average range. Tr. 280.

Assessment of achievement factors showed "multiple learning disabilities including reading, writing, and arithmetic." Tr. 280. Dr. Merin opined Peters has marked difficulties, is functioning between elementary- and middle-school levels, and has "exceptionally poor" processing speed and general vocabulary. Tr. 280. He was unable to read, comprehend, and respond reliably to a personality inventory, but other tests showed mild depression and compromised psychological factors. Tr. 281. Dr. Merin opined Peters's difficulties processing complex information beyond the middle-school level could "preclude an array of jobs that require basic academics as well as problem-solving strategies." Tr. 282. He diagnosed Peters with reading disorder, disorder of written expression, mathematics disorder, persistent depressive disorder, major depressive disorder, generalized anxiety disorder, and an other specified personality disorder, and noted he had psoriasis and a felony conviction. Tr. 283. He concluded,

> The combination of physical, cognitive/intellectual, as well as academic difficulties significantly compromises Mr. Peters'[s] capacity to maintain gainful employment at this time. However, with assistance and appropriate intervention, Mr. Peters may be capable of part-time work. A job coach will be necessary. Additionally, proper and appropriate psychiatric intervention will be necessary in order to help Mr. Peters minimize the negative effects of social withdrawal. In the absence of improvement, Mr. Peters'[s] prognosis for gainful employment is poor.

Tr. 283. He recommended a psychiatric evaluation to determine appropriate medication and job placement and that those with whom Peters works should clearly articulate all goals, responsibilities, and communications in writing. Tr. 283.

In September 2014, Ernesto Rodriguez, M.D., examined Peters as a new rheumatology patient. Tr. 284–87. Dr. Rodriguez observed he was a "pleasant white male in no distress," could walk without adaptive devices, was obese, was accompanied by his father, and used a right ankle monitoring brace. Tr. 284. Physical findings were normal except for diffuse psoriatic lesions over the trunk and extremities, sacroiliac joint tenderness to palpation, thoracic spine tenderness, sciatic notch tenderness, and dactylitis (finger inflammation) over the second digit of his left

hand. Tr. 284–85. On a 28-joint exam, swelling was seen on one and tenderness on none. Tr. 286. Peters reported his current pain was 6 on a 10-point scale and, in the past week, his average pain level had been 5, his best pain level had been 3, and his worst pain level had been 8. Tr. 286. Dr. Rodriguez's assessment was "arthralgias, rule out inflammatory polyarthritis"; "questionable evidence of dactylitis"; well-controlled psoriasis; and morbid obesity that is likely contributing to his musculoskeletal complaints. Tr. 286. Dr. Rodriguez prescribed medication for the arthralgia, ordered imaging and lab work, and advised him to lose weight. Tr. 286–87.

In March 2013, in connection with the Social Security Administration's initial decision, Robin McCallister, Ph.D., reviewed the evidence and completed a psychiatric review technique assessment. Tr. 65–66. She opined Peters has a severe affective disorder and a mild restriction in activities of daily living; mild difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and has had no episode of decompensation of extended duration. Tr. 65.

Dr. McCallister also completed a mental RFC assessment. Tr. 67–69. She opined Peters has no understanding or memory limitation. Tr. 67. On concentration, persistence, and pace, she opined Peters has moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and no significant limitations in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, and make simple work-related decisions. Tr. 67–68. On social functioning, she opined he has moderate limitations in his ability to maintain

socially appropriate behavior and adhere to basic standards of neatness and cleanliness; no significant limitation in his ability to ask simple questions, request assistance, and get along with coworkers and peers without distracting them or exhibiting behavioral extremes; and no evidence of limitation in his ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors. Tr. 68. On adaptation, she opined he has moderate limitations in his ability to respond appropriately to changes in work setting and no significant limitation in his ability to be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, and make plans independently of others. Tr. 68–69.

Overall, Dr. McCallister opined Peters can understand and remember simple and detailed instructions, carry out simple and some detailed instructions in two-hour increments in an eight-hour day, relate adequately without potential for significant problems with coworkers and supervisors, and adapt to changes and pressures in a routine work environment. Tr. 69.

On reconsideration, Pauline Hightower, Psy.D., repeated Dr. McCallister's opinions. Tr. 88–92.

## C.    *Self-Reported Evidence*

In February 2013, Peters, with the help of his sister, completed a function report and reported the following.

He lives in a house with his family. Tr. 207. During the day, he showers, eats, visits his parents next door, watches television, eats again, sleeps, eats again, then sleeps again. Tr. 208. He sometimes sleeps all day and is up all night or does not sleep at all. Tr. 208. His sister sometimes drops off an animal for him to watch for a few days, but his grandmother helps him and he otherwise does not take care of any people or animals. Tr. 208. Daily, he prepares food such as spaghetti, sandwiches, hot dogs, or grilled food. Tr. 209. He can spend two hours doing laundry, two hours

mowing, and one hour doing dishes, but only if someone asks him to. Tr. 209. He sometimes goes outside for an hour and travels by walking or driving. Tr. 210. He shops for groceries at Publix one or two times a week for ten minutes at a time but has to "hurry and get out." Tr. 210. His hobbies are watching television and learning about history, and he does them daily. Tr. 211. He visits his parents daily and goes to church weekly, though he needs reminders to go places and needs someone to accompany him. Tr. 211.

His conditions affect his ability to work because he cannot comprehend what he reads, has "high anxiety with lots of people," writes on a second-grade level, is "easily raged," and is depressed. Tr. 207. He has trouble talking, concentrating, understanding, following instructions, and getting along with others. Tr. 212. Those conditions have been present since childhood. Tr. 208. He has no problem with personal care and needs no reminders to take care of personal needs, groom himself, or take medicine. Tr. 208–09.

He can walk about 280 feet before he needs to rest for 10 minutes. Tr. 212. His attention span varies depending on what he is paying attention to, and he does not finish what he starts, has trouble with written instructions because he cannot comprehend them, and has trouble with spoken instructions because he needs to be told multiple times. Tr. 212. He cannot pay bills, handle a savings account, or use a checkbook or money orders because he has never done so before. Tr. 210. Sometimes people make him mad for no reason, and since his conditions began, he keeps more to himself. Tr. 212. He was fired from a job at a movie theater because the supervisor did not like him but otherwise is "respectable" at getting along with authority figures. Tr. 213. Stress causes him to "shut down or get rageful," and he does not like changes, like his shampoo bottle being left open. Tr. 213.

In April 2013, Peters completed a supplemental anxiety questionnaire and reported the following.

He started having anxiety attacks in December 2012 and last had one a few days before filling out the questionnaire. Tr. 231. He had ten attacks in the past six months and five in the last three. Tr. 232. During an attack, he experiences chest pain and body tightening, argues, thinks of the future, and asks God, "Why?" Tr. 232. Each attack lasts about ten minutes, is exacerbated by thinking of the future, and is alleviated by breaking things or throwing a ball on the ground.[5] Tr. 232. The attacks affect his ability to function because they make him apathetic. Tr. 233.

## D.    *Administrative Hearing*

In October 2014, Peters's counsel submitted a pre-hearing brief to the ALJ. Tr. 256. His counsel observed the record showed diagnoses of major depression, Asperger's syndrome, reading disorder, disorder of written expression, math disorder, and generalized anxiety disorder. Tr. 256. He observed Peters's condition had improved only minimally despite seeking medical treatment and stated,

> As a result of the claimant's conditions he would not be able to maintain the required concentration, pace, and persistence required for even the most unskilled type of work. Additionally, he would not have the ability to interact appropriately with the general public, co-workers, and supervisors. His psychiatric symptoms would result in the need for unscheduled breaks during an eight hour work day and frequent absences when the symptoms are exacerbated; all of which prevent him from engaging in substantial gainful activity.

Tr. 256.

At a November 2014 hearing, Peters testified as follows.

He is 35 years old and graduated from high school, where he learned to read, write, and do simple math. Tr. 33. From 2002 to 2003, he worked for a movie theater as a concession supervisor. Tr. 37–38. He prepared food, supervised around 20 to 40

---

[5]Under "What appears to cause the attacks," Peters wrote, "aRReging/agraing." Tr. 232. It is unclear what that means.

employees at a time, and filed performance reports for the employees. Tr. 38–39. From 2007 to 2008, he worked at a bagel factory loading bagels onto a cart and wrapping and labeling orders. Tr. 36. At first, he had trouble learning the job and lifting and pulling 500 pounds of bagels. Tr. 36–37. In March 2008, he left the bagel factory because he had been living with his sister and she no longer had room for him, and he needed to move to Florida to help take care of his 94-year-old grandmother. Tr. 34, 39–40.

He now lives with his grandmother and helps her by running errands, doing yard work with a riding lawnmower, cooking meals, doing laundry, and driving. Tr. 33–36. He can drive 10 to 20 miles to church, to the doctor, or to take his grandmother to the bank or grocery shopping. Tr. 33. In September 2014, he started treatment for arthritis and inflammation and now takes one pill a day for those conditions. Tr. 42. He has a prescription for pain medication for his feet and back but cannot afford the medication. Tr. 42.

When he moved, he left behind three friends who have not come to visit. Tr. 41. He visited them for a few days in June 2011, and they watched ball games and reminisced. Tr. 41–42. He did not start any medical or other treatment after the move but feels he became depressed because of the difficulty of the move and inability to find a job. Tr. 40–41. He usually locks himself in his room for most of the day, watches television, and does not want to communicate with anyone. Tr. 46. He gets "tense" when he goes out, experiences anxiety and chest pain when he is around others or tries to communicate, and has trouble focusing in groups. Tr. 43–44. His last anxiety attack with chest pain was the Thursday before the hearing in group therapy while talking about his conviction for possession and transmission of child pornography. Tr. 44–45. More than anything else, he feels anxiety, sadness, and hopelessness. Tr. 47. He does not think he could work with other people at a job because of the need to take breaks to get away from people and problems getting along with others, showing up, communicating, following rules, and focusing. Tr. 46.

He has never lived alone or managed a bank account. Tr. 43. When he was working, he cashed checks and got money orders to pay his bills. Tr. 43. He is on probation until January 2019, cannot use a computer until then, does not have a cell phone, and cannot be around children. Tr. 45, 47. His only activity is batting practice in his backyard "from time to time." Tr. 45–46.

Peters's attorney confirmed there are no medical records from the alleged onset date to the date last insured, so the claim would "essentially … be a claim for [supplemental security income] only, with a protective filing date of January 8th, 2013." Tr. 40. The ALJ agreed to leave the record open for 10 days to receive records from Peters's arthritis treatment. Tr. 42–43.

The ALJ asked a vocational expert ("VE") to consider a hypothetical person who had no exertional limitation for any level of work and was limited to understanding and carrying out unskilled, routine, and repetitive tasks; could make basic decisions; could adjust to no more than simple changes in the work environment; and could not work around minor children. Tr. 49.

The VE testified the hypothetical person could perform Peters's past work as a hand packager. Tr. 49–50. If limited to a medium level of exertion with the other limitations, the person could still work as a hand packager. Tr. 50. Peters's attorney asked no follow-up questions. Tr. 50.

## V.    ALJ's Decision

At step one, the ALJ found Peters has not engaged in substantial gainful activity since March 2008, the alleged onset date.  Tr. 18.

At step two, the ALJ observed there was no medical evidence to establish the existence of a medically determinable impairment, much less a severe one, through the date last insured. Tr. 18. He found that, since January 23, 2013 (the date of the application for supplemental security income), Peters has suffered from severe

impairments of major depressive disorder and generalized anxiety disorder. Tr. 18. He found Peters's arthritis is not severe because any resulting limitation has not lasted longer than 12 months and it had not caused significant limitations in Peters's ability to perform basic work functions. Tr. 18–19.

At step three, the ALJ found Peters has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 19. He particularly considered listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).[6] Tr. 19.

The ALJ considered the "paragraph B"[7] criteria to determine if Peters's mental impairments meet or equal the criteria of a listing. Tr. 19–20. He found Peters has a mild restriction in activities of daily living; mild difficulties in social functioning; and moderate difficulties maintaining concentration, persistence, and pace; and has had no episode of decompensation of extended duration. Tr. 19–20. He also considered the "paragraph C"[8] criteria and found Peters does not meet them. Tr. 20.

---

[6] The Social Security Administration revised the mental-disorders listings on September 26, 2016, effective January 17, 2017. *See* Soc. Sec. Admin., *Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138-1 (Sept. 26, 2016). Because the ALJ issued his decision on Decmber 23, 2014, the listings in effect at that time apply. *See id.* at 66138 n.1 (stating that the Social Security Administration would "use the[ ] final rules on or after their effective date, in any case in which we make a determination or decision. We expect that [f]ederal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). All citations to the listings in this order refer to the version that took effect on December 9, 2014, and remained in effect until January 1, 2015.

[7] The criteria in paragraph B are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.04(B), 12.06(B).

[8] Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.00(A), 12.04(C), 12.06(C).

The ALJ found Peters has the RFC to perform all exertional levels of work with additional nonexertional limitations: "He is limited to understanding and carrying out unskilled, routine, repetitive tasks with the ability to make basic decisions and to adjust to no more than simple changes in the work environment, as well as never work in places where minor children are present or nearby." Tr. 20.

The ALJ reviewed the record evidence and hearing testimony. Tr. 21–23. He stated he gave significant weight to agency consultants' opinions that Peters can understand and remember simple instructions, carry out at least simple tasks, and adapt to changes and pressure in a routine work environment. Tr. 22. He stated he gave limited weight to Dr. Marin's opinion that Peters's prognosis for gainful employment was poor because Peters had been able to complete most simple testing and provide historical information, Dr. Marin had based his opinion on non-medical factors such as the felony conviction, and Dr. Marin did not consider that Peters had worked after high school and stopped because he moved to Florida instead of mental conditions. Tr. 22.

The ALJ found that Peters's medically determinable impairments could reasonably be expected to cause the alleged symptoms but his statements on their intensity, persistence, and limiting effects were "not entirely credible." Tr. 21. He explained he found Peters "not fully credible" because objective medical evidence does not support his alleged limitations beyond those in the RFC findings. Tr. 23. He further explained,

> Despite his allegation of a history of depressive and anxious symptoms, the claimant has not sought any regular outpatient mental health counseling, nor has he been hospitalized due to psychologically-based symptoms. The only evidence of record is the two independent evaluations, one by the consultative examiner as part of his disability application, and one requested by vocational rehabilitation. In spite of his history of academic difficulties, the claimant has been able to sustain employment, both unskilled and semi-skilled, since completion of his high school degree, and based on his testimony, he last stopped working because he was moving to Florida. Neither of the two mental health

evaluations revealed any formal thought or psychotic disorder, and he has not required any treatment.

The undersigned further finds that the claimant's allegations regarding his activities of daily living are not credible and that any limitations are self-restricted, as no treating source has advised him to lock himself in his room all day or restrict his movement in any manner. In fact, the fact that he is able to spend most of the day watching television is an indication that he is able to exert significant attention and concentration to perform such activity. Furthermore, he has not been advised to refrain from performing all gainful work activity.

As to claimant's appearance, he looked [his] stated age, was appropriately dressed, and had good personal hygiene and grooming. He remained sitting during the approximate half hour hearing without significant difficulty observed from a lay perspective. He used no assistive devices and his gait was normal, as well as his posture and motor behavior, and displaying appropriate eye contact. At the end of the hearing, the claimant stood up and walked out of the courtroom with a normal gait and no difficulty observed.

As to claimant's demeanor, he was cooperative and responsive to questions, was alert and aware of what went on at the hearing, and he paid good attention, was well focused and understood the questions appropriately giving detailed answers. The claimant's manner of relating, social skills[,] and overall presentation were adequate. His speech was clear, intelligible, logical, coherent, goal directed, and [he] kept [his] trend of thought.

In sum, the claimant exaggerated his symptoms and restrictions as these are not supported by the medical signs and/or diagnostic study findings to account for the level of disability alleged. Having considered all of the above, the undersigned finds that the claimant's allegations of a total inability to work are overstated and unsupported by the medical evidence of record.

Tr. 23.

At step four, the ALJ found Peters can perform his past relevant work[9] as a

---

[9]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. §§ 404.1560, 416.960.

hand packager. Tr. 24. He therefore found no disability from the alleged onset date to the date last insured and from the protective filing date forward. Tr. 24.

## VI. Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm the ALJ's decision if substantial evidence supports it, even if the evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## VII. Analysis

### A. *Step Two*

Peters argues the ALJ erred at step two by failing to find his arthralgia, psoriasis, and morbid obesity severe impairments. Doc. 22 at 5–9. He points to treatment notes showing musculoskeletal swelling, joint tenderness, psoriasis, and obesity. Doc. 22 at 6–9. He contends the ALJ did not base his severity findings on any medical opinion, did not give a reasonable explanation for his findings, and applied the wrong standard. Doc. 22 at 6–9.

The Commissioner responds substantial evidence supports the ALJ's step-two finding because there is no evidence or allegation the arthralgia, psoriasis, or obesity caused a functional limitation. Doc. 23 at 7–13. She contends finding any severe impairment at step two is sufficient, and the ALJ was not required to identify every impairment that could be considered severe. Doc. 23 at 7–9.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant must prove he is disabled. 20 C.F.R. §§ 404.1512, 416.912. The Social Security Administration will consider only impairments the claimant says he has or about which it receives evidence. 20 C.F.R. §§ 404.1512(a)(1); 416.912(a)(1).

At step two, "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a).[10] In other words, it is nonsevere "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *accord* Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

A severity determination "requires an assessment of the functionally limiting effects of an impairment" and consideration of symptom-related limitations and restrictions. SSR 96-3p at *2. The severity of a condition "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986). The "mere existence" of an impairment does not show its effect on the claimant's ability to work. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

An ALJ has no duty to consider a diagnosis if the claimant does not allege it as a basis for disability. *See Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010) ("Robinson, who was represented at the hearing before the ALJ, did not allege that

---

[10]Until March 27, 2017, the definition of a nonsevere impairment was located at 20 C.F.R. §§ 404.1521(a) and 416.921(a). Its text has not changed.

she was disabled due to CFS either when she filed her claim or at her May 2006 hearing. Consequently, the ALJ had no duty to consider Robinson's CFS diagnosis.").

Of the three physical conditions Peters now contends the ALJ should have found severe, he mentioned only the arthralgia at the hearing.[11] *See generally* Tr. 32–47. Substantial evidence supports the ALJ's finding that the arthralgia is nonsevere. The only evidence on the condition is a single treatment note documenting joint tenderness, swelling in one finger, and a diagnosis of arthralgia. There is no evidence the condition limited his ability to perform basic work functions or, if it did, that any limitation lasted or could be expected to last for a year. Peters did not allege any limitation on forms or at the hearing. *See* Tr. 202 (disability report listing only a learning disability and mental issues as conditions that limit his ability to work), 212 (function report checking boxes to indicate his conditions affect only his ability to talk, concentrate, understand, follow instructions, and get along with others), 46 (hearing testimony that he cannot work because of problems getting along with others, showing up, communicating, following rules, and focusing); *accord* Tr. 256 (attorney's pre-hearing brief to the ALJ asserting major depression, Asperger's syndrome, reading disorder, disorder of written expression, math disorder, and generalized anxiety disorder as the only impairments). He testified he had recently begun treatment for arthritis and inflammation, took one pill a day, and had a prescription for pain medication, but alleged no limitation from those conditions and did not explain how they affect him. *See* Tr. 42. Besides failing to claim that any physical

---

[11]"Arthritis" is "inflammation of a joint," and "arthralgia" is "severe pain in a joint, especially one not inflammatory in nature." Stedman's Medical Dictionary (William R. Hensyl et al. eds., 25th ed. 1990). Dr. Rodriguez diagnosed Peters with "[a]rthralgias, rule out inflammatory polyarthritis," Tr. 286, but at the hearing, Peters testified he was receiving treatment for arthritis and inflammation, Tr. 42. The ALJ appears to have considered arthritis and arthralgia as the same or similar conditions, given his description of the record diagnosing arthralgia and finding that arthritis is a medically determinable impairment but not severe. *See* Tr. 18. Peters does not distinguish between arthritis and arthralgia. *See generally* Doc. 22. Given the ALJ's and Peters's discussions, the Court uses "arthralgia" to refer to the condition Dr. Rodriguez diagnosed and the condition about which Peters testified at the hearing.

problem affected his ability to work, he has not shown the arthralgia has more than a minimal effect on him or that it could be expected to interfere with his ability to work. *See Brady,* 724 F.2d at 920.

Peters complains the ALJ applied an improper standard when he found any limitations related to Peters's arthralgia had not lasted longer than 12 months because a condition can also be disabling if it is expected to last for at least 12 months. Doc. 22 at 9. Peters has pointed to no evidence his arthralgia is expected to last for at least 12 months. *See generally* Doc. 22. Regardless, the ALJ gave another reason for finding the arthralgia nonsevere: it does not significantly limit Peters's ability to perform basic work functions. *See* Tr. 19. Substantial evidence supports the finding the arthralgia is nonsevere. *See* 20 C.F.R. §§ 404.1522(a), 416.922(a) (impairment is not severe if it does not significantly limit claimant's ability to do basic work activities).[12] Reversal and remand for further consideration of arthralgia are unwarranted.

---

[12]Separate from his argument on the 12-month standard, Peters states, "The Commissioner's application of a higher severity standard was not substantially justified under the Equal Access to Justice Act," and cites *Stratton v. Bowen,* 827 F.2d 1447, 1453 (11th Cir. 1987). Doc. 22 at 6.

Under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, "[A] court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

In *Stratton,* a plaintiff who had prevailed on his claim for benefits appealed a district court's decision denying him attorney's fees under the EAJA because it found "the Secretary's litigation position was substantially justified under the circumstances." *Stratton,* 827 F.2d at 1449 (internal footnote omitted). The Eleventh Circuit held the application of an incorrect severity standard (causing the ALJ to find the plaintiff had no severe impairment and deny his claim at step two) had not been substantially justified and the district court had abused its discretion in denying the motion for attorney's fees. *Id.* at 1453.

Here, Peters has not shown the ALJ applied an improper standard or otherwise erred.

The ALJ did not evaluate the other two conditions Peters now contends are severe: obesity and psoriasis.

Any error in failing to consider Peters's psoriasis is harmless. As described above, Peters alleged only mental limitations leading up to the hearing. He did not mention psoriasis or any associated limitation at the hearing. *See generally* Tr. 32–47. He has pointed to no evidence or allegation it causes any limitation and does not contend it has more than a minimal effect on him or that it could be expected to interfere with his ability to work. Indeed, other than identifying psoriasis as an impairment the ALJ should have found severe in the heading of his argument, Peters does not elaborate on why it is severe or how it affects his ability to work. *See generally* Doc. 22. Reversal and remand for further consideration of psoriasis are unwarranted.

The Social Security Administration has issued special guidance for consideration of obesity. *See* SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Absent contrary evidence, the Social Security Administration will accept a diagnosis of obesity from a treating source or consultative examiner. *Id.* at *3. An ALJ should consider obesity throughout the sequential evaluation process. *Id.* at *1. The combined effects of obesity with other impairments may be greater than the effects of each impairment separately, and obesity can affect both physical and mental health. *Id.* at *1, 3. It can complicate chronic cardiovascular, respiratory, and musculoskeletal problems; contribute to mental impairments like depression; cause subtle loss of mental clarity and slowed reactions; or increase the risk of other impairments. *Id.* at *3. The Social Security Administration "will not make assumptions about the severity or functional effects of obesity combined with other impairments" but will "evaluate each case based on the information in the case record." *Id.* at *6.

At step two, obesity is evaluated under the same severity standard as any other medical condition: it is severe if "it significantly limits an individual's physical or

mental ability to do basic work activities." *Id.* at \*4. No specific level of weight equates to a severe impairment, and "descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) [do not] establish whether obesity is or is not a 'severe' impairment for disability program purposes." *Id.*; *accord* POMS DI 24570.001(C)(6). Instead, "an individualized assessment of the impact of obesity on an individual's functioning" is necessary to determine if obesity is severe. SSR 02-1p, at \*4.

An ALJ does not err in failing to find obesity severe if the claimant does not claim it is a severe impairment and his physician does not elaborate on the severity or nature of the obesity or conclude it is a functional impairment. *James v. Barnhart*, 177 F. App'x 875, 878 n.2 (11th Cir. 2006); *see also Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) (remand not required where claimant did not claim obesity as an impairment in his disability application or at the hearing, and although references to weight in medical records were likely sufficient to alert the ALJ to the impairment, the claimant did not specify how the obesity impaired his ability to work but merely speculated that his weight makes it more difficult to stand and walk); *Gary v. Astrue*, No. 1:08cv411–CSC, 2009 WL 3063318, at \*2–3 (M.D. Ala. Sept. 22, 2009) (unpublished) (generalized statement that claimant is obese without facts or evidence to support that obesity affects her ability to work or evidence that a physician imposed limitations based on obesity does not satisfy claimant's burden of showing substantial evidence does not support ALJ's decision).

Here, any error in failing to find Peters's obesity severe or otherwise consider it is harmless. Although Dr. Rodriguez diagnosed Peters with morbid obesity, that diagnosis and classification does not establish it is severe or causes any functional limitation. *See* SSR 02-1p. Dr. Rodriguez stated the obesity may be contributing to Peters's musculoskeletal complaints but did not elaborate on its severity or functional effects. *See generally* Tr. 286. No examiner opined obesity would affect Peters's RFC, and he did not reference it before now. In his brief, he points generally to his height and weight and standards for obesity, but identifies no evidence the obesity would

significantly limit his ability to do basic work activities, has more than a minimal effect on him, or could be expected to interfere with his ability to work in any way. Reversal and remand for further consideration of obesity are unwarranted.

**B.      *Duty to Develop the Record***

Peters argues the ALJ did not fulfill his duty to develop the record and contends he should have ordered a consultative physical examination to obtain an opinion on his RFC. Doc. 22 at 9. He observes he had only recently started treatment for physical conditions and the record contained no evidence on their functional impact. Doc. 22 at 9. The Commissioner responds the ALJ did not need to order a consultative examination because the record contained sufficient information to support the ALJ's decision and Peters has shown no prejudice or evidentiary gap. Doc. 23 at 14–16.

If a claimant's medical sources cannot or will not provide sufficient evidence for a disability determination, the Social Security Administration may ask the claimant to have physical or mental assessments at its expense. 20 C.F.R. §§ 404.1517, 416.917. A consultative examination may be necessary if there is an inconsistency in the evidence, medical-source records do not contain necessary evidence, necessary evidence cannot be obtained for reasons beyond the claimant's control, necessary technical or specialized evidence is not available from the claimant's medical sources, or there is an indication of a change that is likely to affect the claimant's ability to work, but the severity of the impairment is not established. 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

The ALJ has a duty to develop a full and fair record, regardless of whether the claimant is represented by counsel. *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). If the ALJ fails to fulfill his duty to fully develop the record, remand is warranted if "the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Brown,* 44 F.3d at 935 (quotations omitted). "In other words, there must

be a showing of prejudice before [a court] will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [ALJ] for further development of the record. Prejudice requires a showing that the ALJ did not have all of the relevant evidence before him in the record (which would include relevant testimony from claimant), or that the ALJ did not consider all of the evidence in the record in reaching his decision." *Mosley v. Acting Comm'r of Soc. Sec. Admin.*, 633 F. App'x 739, 742 (11th Cir. 2015) (internal quotations omitted).

Peters has not shown a consultative physical exam was necessary. Despite being represented by counsel, he did not alert the ALJ that any physical condition impacted his ability to work. He had recently begun treatment for arthritis and inflammation but alleged no limitation based on those conditions, and because he did not mention psoriasis or obesity and the record contains no evidence they would cause functional limitations, the ALJ had no obligation to consider them. *See Robinson*, 365 F. App'x at 995. Throughout the proceedings, he alleged limitations due only to psychological conditions. The ALJ evaluated the evidence Peters submitted on those conditions (high-school records, notes from a consultative examination, and notes from an examination for vocational rehabilitation, Tr. 258–83), explained the weight he gave the evidence, and explained how it supported his decision. *See* Tr. 15–25. Peters has shown no evidentiary gap as to the conditions he alleges render him disabled and no prejudice given the absence of evidence that his physical conditions caused any additional limitation. Reversal and remand for further development of the record are unwarranted.

## C.    *Pain Standard*

Peters argues the ALJ did not comply with the Eleventh Circuit's pain standard. Doc. 22 at 7–8. Other than describing the standard, he does not explain how the ALJ erred. *See generally* Doc. 22 at 7–8. The Commissioner responds Peters waived the issue by failing to fully brief it, but the ALJ nevertheless gave good reasons, supported by substantial evidence, for finding Peters not entirely credible.

Doc. 23 at 12 n.9.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of his alleged symptoms and their effect on his ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). In doing so, an ALJ must consider all available evidence, including objective medical evidence and statements from the claimant and others. 20 C.F.R. §§ 404.1529(c)(2)–(3), 416.929(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, he must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). A reviewing court should ask not whether the ALJ could have reasonably credited a claimant's testimony, but whether the ALJ had been clearly wrong in discrediting it. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

To preserve an issue for appeal, the party must raise the "specific issue to the district court" so that the district court has "an opportunity to consider the issue and rule on it." *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). Generally, this means that the issue must be plainly and prominently raised, with supporting arguments

and citations to the evidence and to relevant authority. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

By not briefing it, Peters has waived his argument on the ALJ's application of the pain standard. In any event, he has not shown the ALJ erred. On disability forms, he alleged no pain or other symptom from any physical impairment. *See* Tr. 202 (disability report), 212 (function report). At the hearing, he testified he had recently begun treatment and medication for arthritis and inflammation and had a prescription for pain medication for his feet and back, *see* Tr. 42, but presented no testimony on the severity or nature of that pain and did not contend it caused any limitation. *See generally* Tr. 32–51. He testified he stayed in his room all day but attributed that to his depression and desire to avoid communicating with others. *See* Tr. 46. Absent any allegation on the intensity, persistence, or limiting effects of his pain or other physical symptoms, there was nothing for the ALJ to evaluate.

In evaluating Peters's alleged psychological symptoms in the RFC analysis, the ALJ explained the standard for evaluating allegations of subjective symptoms and found Peters not entirely credible because his allegations conflict with the objective evidence, he has not sought regular mental health counseling or been hospitalized for psychological problems, he has been able to work since graduating from high school, and he stopped working because of a move instead of psychological symptoms. Tr. 21, 23. Those reasons—supported by substantial evidence—support the ALJ's credibility finding, and Peters has not challenged the ALJ's evaluation of his psychological conditions. *See generally* Doc. 22.

Reversal and remand for further consideration of Peters's subjective complaints are unwarranted.

## VIII. Conclusion

The Court affirms the Commissioner's decision and directs the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on September 13, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record